**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,

       *Plaintiff - Appellant*,

  v.

BENJAMIN E. HOSKINS,
individually and as officer of
Defendants Dream Financial; Logic
Solutions, LLC; Oxford Debt
Holdings, LLC Sell It Vizions, LLC;
and Global Finance Group, LLC;
LEANNE RODGERS, F/K/A Leanne
Hoskins,

       *Defendants - Appellees*,

and

IVY CAPITAL, INC., DREAM
FINANCIAL, OXFORD
FINANCIAL, LLC,

       *Defendants*.

No. 24-5747

D.C. No.
2:11-cv-00283-
JCM-NJK

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted October 22, 2025
Phoenix, Arizona

Filed August 4, 2026

Before: Susan P. Graber, Bridget S. Bade, and Kenneth K.
Lee, Circuit Judges.

Opinion by Judge Lee;
Partial Dissent and Partial Concurrence by Judge Bade

## SUMMARY[*]

### Federal Debt Collection Procedure Act / FTC

The panel reversed the district court's rulings blocking the Federal Trade Commission's efforts to collect on a money judgment it obtained against Benjamin Hoskins and his wife Leann Rodgers stemming from a telemarketing scam, and remanded for further proceedings.

The FTC obtained a money judgment of over $130 million against Hoskins and about $1.5 million against Rodgers, who received proceeds from the scam. The FTC later obtained a writ of execution under the Federal Debt Collection Procedure Act ("FDCPA") to levy on their house in Las Vegas. The district court blocked the FTC's collection efforts, ruling that enforcement was barred by the Nevada

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

statute of limitations. The district court also quashed the writ of execution, holding that under Nevada law the FTC had to file a separate action to establish that the trust holding the house is Rodgers's alter ego.

The panel held that the district court erred in ruling that Nevada's six-year statute of limitations precluded the FTC from enforcing the judgment against Rodgers. The FDCPA, which has no time limit for collecting debts owed to the federal government by writ of execution, preempts state statutes of limitations for enforcement of judgments. The panel rejected the district court's reasoning that the FDCPA does not apply because a "debt" under the statute must be owed to the United States—and here the proceeds from the judgment will ultimately be disbursed to the victims. The judgment against Rodgers on its face states that $1.5 million is payable to the FTC, and is thus a "debt" owing to the United States under the FDCPA.

The panel held that the district court erred in quashing the writ of execution because, contrary to the district court's ruling, the FTC need not show that the trust holding the house was Rodgers's alter ego under Nevada law. Under the FDCPA, the FTC may levy any property, however held, in which Hoskins and Rodgers have a substantial nonexempt interest. They have such an interest in the house because of their status as trustees and beneficiaries of the trust.

Judge Bade dissented in part and concurred in part. She dissented from the majority's decision to reverse the order quashing the writ of execution because she disagreed with the majority's conclusion that the FDCPA applied to the enforcement of a disgorgement decree entered in favor of the FTC. Because the disgorgement decree at issue did not fall within the statutory definition of debt, the FDCPA did not

apply, and Nevada law governed the procedures of the writ of execution sought by the FTC.

She concurred, however, in the majority's decision to reverse the district court's order precluding future enforcement of the judgment. As an incident of sovereignty, the United States and its instrumentalities are not bound by general statutes of limitations unless expressly named. The Nevada statute of limitations for the enforcement of a judgment does not expressly apply to the federal government. Therefore, the district court erred in forbidding the FTC from enforcing the disgorgement decree by means under than the particular writ of execution sought below.

---

## COUNSEL

Matthew M. Hoffman (argued), Crystal Ostrum, and Matthew B. Weprin, Attorneys; H. Thomas Byron III, Deputy General Counsel; Anisha S. Dasgupta and Lucas Croslow, General Counsel; Federal Trade Commission, Washington, D.C.; for Plaintiff-Appellant.

Caleb Kruckenberg (argued) and Christian Clase, Center for Individual Rights, Washington, D.C.; David R. Koch, King Scow Koch Durham LLC, Henderson, Nevada; Jeffrey Willis, Snell & Wilmer LLP, Tucson, Arizona; for Defendants-Appellees.

**OPINION**

LEE, Circuit Judge:

This appeal is the latest turn in the government's long and winding pursuit of telemarketing scam artists who bilked consumers out of more than $130 million. For years, Benjamin E. Hoskins and his co-defendants promoted worthless "business coaching" services that amounted to tips on how to sell items on eBay. In 2011, the Federal Trade Commission ("FTC") sued them and obtained a money judgment of over $130 million against Hoskins and about $1.5 million against his wife, Leanne Rodgers, who received proceeds from the scam.

But the defendants hampered the government's efforts to collect on the judgment by weaving a web of shell entities to shield themselves. The FTC finally obtained a writ of execution under the Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3001–3308 ("FDCPA"), to levy on Hoskin and Rodgers' house in Las Vegas. The district court blocked the FTC's collection efforts, ruling that the enforcement was barred by the Nevada statute of limitations. It also quashed the writ of execution, holding that under Nevada law the FTC had to file a separate action to establish that the trust holding the house is Rodgers's alter ego.

We reverse both rulings. We have long held that the FDCPA preempts a state statute of limitations for the enforcement of judgments. *See United States v. Gianelli*, 543 F.3d 1178, 1182–83 (9th Cir. 2008). The district court, however, reasoned that the FDCPA does not apply because a "debt" under the statute must be owed to the United States—and here the proceeds from the judgment will ultimately be disbursed to the victims. But the judgment

against Rodgers on its face states that $1.5 million is payable to the FTC. It is thus a "debt" owing to the United States under the FDCPA, and the Nevada statute of limitations is preempted.

We also reverse the order quashing the writ of execution. Contrary to the district court's ruling, the FTC need not show that the trust holding the house is Rodgers's alter ego under Nevada law. Under the FDCPA, the FTC may levy any property, however held, in which Hoskins and Rodgers have a substantial nonexempt interest. They have such an interest in the house because of their status as trustees and beneficiaries of the trust. Accordingly, the writ of execution was properly issued and should not have been quashed.

## BACKGROUND

### I.   Factual Background

#### A.  The telemarketing scheme

Starting in 2007, Benjamin Hoskins and his co-defendants operated a telemarketing scheme that scammed consumers out of more than $130 million. Operating as Ivy Capital, the defendants sold worthless "business coaching" services with false promises that their program would enable people to earn up to $10,000 per month. At the same time, the defendants engaged in deceptive tactics to stymie consumers' efforts to receive refunds. The scheme played out in four stages.

First, the defendants used "lead generators"—such as promotional websites, blast emails, and internet advertisements—to collect the contact information of potential targets. The lead-generation materials promised people that if they followed a work-from-home program that cost between $50 and $250, they could make hundreds, if

not thousands, of dollars per week. Unsuspecting consumers provided their contact information in response to the materials.

Second, telemarketers called those consumers to persuade them to spend thousands of dollars on a personal business coaching program. Sales representatives promised the consumers that they would receive everything they needed to start internet businesses that would generate substantial income with little effort. For example, as part of the business coaching program, sales representatives guaranteed that consumers would get weekly coaching sessions with experts. The program's price varied, ranging from $2,000 to over $20,000.

The defendants falsely represented to consumers that the coaches were experts who had their own profitable internet businesses. The coaches did not have any formal education or specialized training, and they were not even required to complete the defendants' own business coaching program. The most that any "coaching expert" taught a consumer was how to sell items on eBay—something that anyone could research online without having to spend thousands of dollars on a business coaching program.

To sell the program, sales representatives used testimonials from "successful" consumers. But the testimonials were deceptive. Several of the defendants' employees testified that a "success story" included virtually anyone who had sold anything on eBay for any amount. Most, if not all, consumers who purchased the business coaching program could not recoup the cost of the program through eBay sales.

Third, the defendants upsold a variety of products and services that produced little to no value to consumers who

had already purchased the business coaching program. In one instance, a consumer testified that, after spending over $7,000 on "upsell" products alone, he sold three items on eBay. One was a legitimate sale that did not come close to earning back his initial investment. And the other two were purchases that the *consumer* made to confirm that his website was working.

Fourth, the defendants engaged in deceptive strategies to prevent consumers from receiving refunds and voicing complaints. Many consumers, after making good-faith efforts to establish a successful internet business using defendants' plans and services, became dissatisfied and sought refunds from Ivy Capital. The defendants had a strict three-day refund policy, but most consumers were not told of this policy. And even when consumers did seek a refund within three days, the defendants imposed substantial obstacles, such as not responding to phone calls. Consumers who were persistent enough to speak with someone at the "Resolutions Department" were cajoled, intimidated, berated, and often eventually denied a refund.

Portions of the tens of millions of dollars extracted through this scam were funneled to entities controlled by the defendants' spouses, including Rodgers. Rodgers used a company called Oxford Financial, LLC, to shift money from the Ivy Capital enterprise into Hoskins' and Rodgers' personal accounts. Rodgers personally received over $1 million from Oxford between May 2007 and January 2011, as well as additional financial benefits in the form of school tuition, a personal credit card, IRS fees, a vehicle, and other personal and household expenses.

## B. The judgments against Hoskins and Rodgers

In 2011, the FTC sued numerous defendants who operated the scam and/or who received money from it. All the defendants settled with the FTC except for Hoskins, Rodgers, and their affiliated companies. The district court in 2013 granted summary judgment to the FTC and entered a monetary judgment against these defendants. The court held Hoskins and his company, Dream Financial, jointly and severally liable with the settling defendants for $130,375,057.52; Oxford liable for $1,529,292.25; and Rodgers liable for $1,128,795.78. The judgment characterized these awards as "equitable monetary relief." The judgment maintained an existing freeze on Hoskins's and Rodgers's assets and provided that it would be lifted only as necessary to affect the turnover of their assets in partial satisfaction of the monetary relief awards.

On appeal, this court affirmed the liability determination and the judgment against Hoskins but held that Rodgers should be jointly and severally liable with Oxford because the company was her alter ego. *FTC v. Ivy Cap., Inc.*, 616 F. App'x 360, 360–62 (9th Cir. 2015) (unpublished). On remand, the district court entered an amended judgment against Rodgers, holding her liable for $1,550,848.48 (including prejudgment interest). Consistent with its usual practice, the FTC intends to use any funds that it recovers from Hoskins and Rodgers to pay back the victims of Hoskins's business-coaching scam.

## C. The FTC's collection efforts

Hoskins and Rodgers satisfied little of their judgments. The judgment balances on Hoskins and Rodgers as of July 2023 were about $131 million and $1.4 million, respectively. The FTC spent years investigating their assets so that it could

collect the judgments and provide redress to victims of the scam, but Hoskins and Rodgers have thus far evaded the FTC's collection efforts.

The property at issue is Hoskins and Rodgers's current residence ("the Corona Vista property"), which was bought with the proceeds from the sale of their prior home ("the Drifting Shadow property") in violation of the court-ordered asset freeze.  In 2013, Hoskins and Rodgers moved for relief from the asset freeze to permit them to sell the Drifting Shadow property, claiming that they could not make mortgage and homeowners-association payments and that the property was at risk of foreclosure. The court said that it would permit them to put the Drifting Shadow property up for sale, but that it would not necessarily permit Hoskins and Rodgers to buy a new house with the proceeds.

Faced with these restrictions, Hoskins and Rodgers did not sell at that time. Instead, in 2016, they conveyed the Drifting Shadow property to the Hambil Trust ("the Trust"), of which Hoskins and Rodgers are trustees and beneficiaries. The Trust, in turn, conveyed the property to an LLC of which the Trust is the managing member. Although Hoskins and Rodgers never sought court approval to sell the Drifting Shadow property through the Trust, they eventually sold the property.

In 2021, Rodgers bought the Corona Vista property using some proceeds from the sale of the Drifting Shadow property. Although Rodgers at first named herself as the buyer on the purchase agreement, she later tried to obscure her interest in the property through an elaborate web of shell entities. Rodgers instructed the title company that the buyer would be "Monte Bello, LLC," and requested that the title company "[l]eave my name off of [the deed] if possible."

Monte Bello is owned by Resolute 21, LLC, which in turn is owned by the Trust.

## II. Procedural History

### A. The writ of execution

In August 2023, after learning that Hoskins and Rodgers had circumvented the court's orders by selling the Drifting Shadow property and purchasing the Corona Vista property, the FTC applied for a writ of execution under the FDCPA. The FTC sought to levy on the Corona Vista property to satisfy part of the outstanding judgments against Hoskins and Rodgers. The district court issued the writ.

Rodgers then moved to quash the writ of execution. The magistrate judge granted the motion, holding that, under Nevada law, the FTC had to "file a separate action for alter ego" to establish Rodgers's interest in the property. The FTC objected, arguing that the FDCPA preempts state law, but the district court denied the objection, agreeing that a separate action for alter ego was required.

### B. Relief from judgment

Rodgers separately moved for relief from the judgment under Federal Rule of Civil Procedure 60(b)(6), arguing that enforcement was barred by Nevada's six-year statute of limitations. The district court agreed and granted the motion, rejecting the FTC's argument that the FDCPA preempted that state law. The court later entered an order stating that the judgment against Rodgers was "of no further force or legal effect, as any attempt to enforce the judgment is barred by Nevada's six-year period of limitation governing enforcement of a judgment." For these reasons, the court held that "the FTC may no longer seek to collect or enforce the judgment against Rodgers" and directed the FTC to

release any liens affecting real property or other recordings of the judgment.

## STANDARD OF REVIEW

The district court's determination that the FDCPA does not preempt Nevada's six-year statute of limitations raises a question of statutory construction that we review de novo. *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 996 (9th Cir. 2017). For a motion to quash, we review for abuse of discretion, *United States v. Chen*, 99 F.3d 1495, 1499 (9th Cir. 1996), but an error of law is an abuse of discretion, *Yokoyama v. Midland Nat'l Life Ins.*, 594 F.3d 1087, 1091 (9th Cir. 2010).

## DISCUSSION

## I.  The district court erred in barring enforcement of the judgment against Rodgers.

The FDCPA establishes the exclusive procedures for the United States to recover a judgment on a debt and expressly preempts inconsistent state law. 28 U.S.C. §§ 3001(a), 3003(d). Congress enacted the FDCPA in 1990 "to create a comprehensive statutory framework for the collection of debts owed to the United States government." H.R. Rep. No. 101-736, at 23 (1990). [1] Before that time, the

---

[1] We cite H.R. Rep. No. 101-736 merely to provide general background on an obscure statute that is distinct from a more commonly known statute that shares the same acronym, the Fair Debt Collection Practices Act. 15 U.S.C. §§ 1692–1692p (statute barring debt collectors from engaging in abusive and deceptive tactics against consumers). But in interpreting the meaning of the statutory provisions in the Federal Debt Collection Procedure Act, we rely on the statutory text, not some larger purpose not defined in the statute. *See Salisbury v. City of Santa Monica*, 998 F.3d 852, 859 (9th Cir. 2021) ("Vague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the

federal government had to rely on state-law procedures to enforce its judgments. *See* FED. R. CIV. P. 69(a)(1) (stating that the procedure on execution of a money judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies"). By enacting the new law, Congress sought to "bring an end to the . . . situation whereby a crazy patchwork of laws in the 50 states dictate[s] the debt collection remedies available to [the government] in collecting Federal debts." H.R. Rep. No. 101-825, at 19 (1990).

The FDCPA defines "debt" broadly to include any amount "owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, *restitution*, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States, or *other source of indebtedness to the United States*." 28 U.S.C. § 3002(3)(B) (emphases added). The statute further defines "United States" to include "an agency, department, commission, board, or other entity of the United States." *Id.* § 3002(15)(B).

The FDCPA provides several ways for the government to enforce a judgment debt. *See id.* §§ 3202–3205. The one at issue here is execution on property. Under the statute, "[a]ll property in which the judgment debtor has a substantial nonexempt interest shall be subject to levy pursuant to a writ of execution." *Id.* § 3203(a). A district court may issue a writ of execution upon written application of counsel for the United States. *Id.* § 3203(c)(1).

---

*specific* issue under consideration.") (alterations adopted) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993)).

The district court erred in holding that Nevada's six-year statute of limitations precludes the FTC from enforcing the judgment against Rodgers. The FDCPA has a sweeping preemption provision: "This chapter shall preempt State law to the extent such law is inconsistent with a provision of this chapter." 28 U.S.C. § 3003(d). The FDCPA also has no time limit for collecting debts owed to the federal government by writ of execution. *See id.* § 3203. We have thus held that the FDCPA preempts state statutes of limitations for enforcement of judgments. *See Gianelli*, 543 F.3d at 1183 ("[T]he California state law at issue, . . . which would preclude enforcement of a restitution judgment after ten years from the entry of that judgment, is . . . an inconsistent state law and is, therefore, preempted.").

## A.  *Gianelli* controls here.

In *Gianelli*, a criminal defendant was ordered to pay $125,000 in restitution to the United States. *Id.* at 1181. More than a decade after the district court issued that order, the government applied for a writ of execution under the FDCPA, seeking to levy the writ on a house and land owned by the defendant. *Id.* The defendant argued that a ten-year California statute of limitations barred the government from collecting on the balance of the debt. *Id.* at 1182.

We disagreed, noting that the FDCPA "provides no time limit for the collection of debts by writ of execution" and holding that it thus preempts state statutes of limitations. *Id.* at 1183. As we explained, "because the purpose of the FDCPA is to create a comprehensive statutory framework for the collection of debts owed to the United States government and to improve the efficiency and speed in collecting those debts, . . . a state law limiting such collection is inconsistent with the purpose of the act and is,

therefore, preempted." *Id.* (citation modified); *cf. Bensal*, 853 F.3d at 997–98 (holding that the FDCPA preempted a California law concerning the disclaimer of an interest in a trust).

The district court here, however, concluded that *Gianelli* was not controlling because the judgment entered against the defendant there was criminal rather than civil. But the FDCPA explicitly defines "judgment" as "a judgment, order, or decree entered in favor of the United States in a court and arising from a *civil or criminal* proceeding regarding a debt." 28 U.S.C. § 3002(8) (emphasis added). By its plain text, the FDCPA applies to judgments in both civil and criminal cases. Indeed, another circuit has cited *Gianelli* when holding that the FDCPA applied to a civil judgment. *See FTC v. Namer*, 481 F. App'x 958, 960 (5th Cir. 2012) (unpublished) ("We agree with *Gianelli* on the following point [that the FDCPA preempts inconsistent state laws] as well.").

## B. The judgment against Rodgers, which is payable to the FTC, qualifies as a debt under the FDCPA.

The district court offered another reason why the FDCPA purportedly does not apply here: It did not consider Rodgers's debt to be "owed to the federal government," as required under the statute, because "the purpose of . . . disgorgement is to refund any ill-gotten gains to consumers, not the federal government." We disagree.

The FDCPA expressly defines "debt" to include "an amount that is owing to the United States on account of . . . restitution . . . or other source of indebtedness to the United States." 28 U.S.C. § 3002(3)(B). Those are the words that Congress chose, and we must heed them. "When interpreting a statutory term, we first give effect to [the] statutory

definition[].” *Salisbury*, 998 F.3d at 860 (citation omitted). In defining “debt” under the FDCPA, Congress used broad terms that encompass the judgment here: Rodgers “ow[es]” this amount because her judgment to pay money to the FTC is obviously a “source of indebtedness to the United States.” Contrary to the dissent’s suggestion, there is nothing tautological about our reading of the statute.

The judgment in this case was expressly “entered in favor of the commission.” Under the judgment, Rodgers has a legal duty to pay the federal government. The debt is thus owed to the federal government. The dissent is right in that to determine the actual beneficiary of a monetary judgment, we may at the very least look to the judgment itself and the “face of the record.” Dissent at 38. The FDCPA explicitly defines “judgment” as “a judgment, order, or decree entered in favor of the United States in a court and arising from a civil or criminal proceeding regarding a debt.” 28 U.S.C. § 3002(8). And the “face of the record” is abundantly clear: the judgment in this case, by its terms, was “entered in favor of the commission.”[2] *Cf. FTC v. Lederman (In re Lederman)*, No. SV 94-22688 AG, 1995 WL 792072, at *5 (Bankr. C.D. Cal. June 26, 1995) (concluding that the FTC had “standing to assert the nondischargeability of its judgment against [a debtor]” and could be “considered a creditor when it ha[d] a claim against a debtor based on the debtor’s alleged violation of the FTC Act”). That the FTC intends to use any money that it collects from Rodgers for

---

[2] When the district court issued abstracts of judgments in 2015 to enable the FTC to obtain a lien on the Drifting Shadow property, *see* 28 U.S.C. § 3201, the court identified the FTC as the “Part[y] in whose favor judgments have been obtained.”

restitution to consumers does not take the debt outside the scope of the FDCPA.

The dissent contends that the catch-all provision in the FDCPA's definition of "debt"—"other source of indebtedness to the United States"—should be read narrowly to exclude the judgment owing to the FTC. 28 U.S.C. § 3002(3). Dissent at 32-35. But the structure of the statutory provision reinforces the intended function of a catch-all provision: it eliminates potential loopholes, fills in possible gaps, and tries to minimize disputes arising out of unforeseen circumstances. *See CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 292 (2011) ("[T]he very purpose of a catch-all provision . . . is to avoid the necessity of listing each matter . . . falling within it."); *Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1152 (9th Cir. 2019) (determining that, viewed in context, certain phrases that "are naturally read as catch-all categories . . . are broader than the more specific topics enumerated"). Here, the statute defines "debt" broadly to include all sorts of debt—any "amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of a cost incurred by the United States"—and then, as a catch-all provision, adds "or other source of indebtedness to the United States." 28 U.S.C. § 3002(3)(B). The catch-all provision here thus eliminates a potential loophole that Rodgers is trying to exploit.

The dissent also contends that our reading of the catch-all provision renders superfluous the earlier phrase "an amount that is owing to the United States." Dissent at 33. It goes as far as to say that the definition of debt has two statutory requirements—(1) an amount "owing to the United

States" (2) "on account of a . . . source of indebtedness to the United States," the latter of which the dissent construes as a debt that "will inure to the benefit of the United States." Dissent at 32. If Congress wanted to say a debt must ultimately inure to the benefit of the United States, it could have said so. But it did not. Further, the catch-all provision's reference to an "other source of indebtedness *to the United States*" is not superfluous. 28 U.S.C. § 3002(3)(B) (emphasis added). If the provision merely stated "or other source of indebtedness," it could potentially add ambiguity, as the term "other" could suggest that it includes a debt owed to another party.[3]

Finally, the dissent leans on 28 U.S.C. § 3001(c) to argue that the definition of "debt" under 28 U.S.C. § 3002(3) is not what the plain text says. Dissent at 30-33. Section 3001(c) states that the FDCPA "shall not apply to an amount owing that is not a debt." The dissent argues that the majority's interpretation of "debt" under § 3002(3) would render § 3001(c) a nullity. Dissent at 33. But the most plausible reading of § 3001(c) is that it merely reinforces the definition of "debt" under § 3002(3)—a belt-and-suspenders approach to underscore that "debt" covers only what is included in that definition. *See, e.g.*, *Facebook, Inc. v. Duguid*, 592 U.S. 395, 407 n.7 (2021) ("'It is no superfluity,' however, for Congress

---

[3] Suppose, for example, Party A owes a debt to Party B, who in turn owes a debt to the United States. By adding "indebtedness *to the United States*," the statute makes clear that the federal government cannot try to collect on Party A's debt to Party B because Party A's debt is not an "other source of indebtedness to the United States." Similarly, the previous clause in the laundry list of sources of debt—"recovery of a cost incurred *by the United States*"—clarifies that a cost incurred by a party other than the United States is not a debt under the FDCPA. 28 U.S.C. § 3002(3) (emphasis added).

to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. . . . [E]ven if [both] functions often merge, Congress may have 'employed a belt and suspenders approach' in writing the statute." (citations omitted)); *United States v. Myers*, 170 F.4th 1180, 1188 (9th Cir. 2026) ("Congress may use a 'belt and suspenders approach' to dispel any doubt about a statute's scope." (citation omitted)). This approach leaves little ambiguity for what the text means. So, for example, the federal government could not say that someone owes a "debt" to the United States based on an unenforceable oral contract because that would not fall within the statutory definition.

Importantly, § 3001(c) certainly does not support the dissent's view that the wording somehow creates a new definition of debt beyond the statutory text to include the requirement that "debt" must inure to the benefit of the government. The dissent cites legislative history to support its view that "debt" should be defined by a "direct beneficiary test" and that such a definition is what would most "make[] sense" in aligning with Congress's intent. Dissent at 36-37. But legislative history—no matter how clear—cannot override statutory text. *See Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 728 (9th Cir. 2011).

Our decision today tracks the Fifth Circuit's opinion in *FTC v. National Business Consultants, Inc.*, 376 F.3d 317 (5th Cir. 2004). In that case, the Fifth Circuit held that the FDCPA's relevant text was "clear and unambiguous" and that a judgment requiring defendants to make payments to the FTC is a "debt" for purposes of the FDCPA even if "a portion of the judgment representing the damages awarded for consumer redress may ultimately be paid by the government to the defrauded [victims]." *Id.* at 320. As the court explained, where "[t]he terms of the judgment render

[defendants] . . . liable to the FTC, not to private individuals, for the entire amount of the judgment[,] . . . the United States, not any individual or group of individuals, is the formal owner of the judgment." *Id.* Further, "nothing in the statutory text requires that the government be the exclusive beneficiary of the judgment for the [FDCPA] to apply." *Id.* . . [4]

So too here. Because the judgment makes Rodgers liable to the FTC—not to private individuals—it is an amount owing to the United States and thus is subject to the FDCPA. The defendants argue that we should look beyond the four corners of the judgment and instead determine the ultimate beneficiary of the judgment. We decline to do so. The statutory text says nothing about the beneficiary of the judgment but instead refers simply to money that is "ow[ed] to the United States." Here, the $1.5 million judgment payable to the FTC is "an amount that is owing to the United States on account of . . . restitution" or "other source of indebtedness to the United States." 28 U.S.C. § 3002(3)(B). It falls squarely within the statutory definition of "debt."

In any event, if we looked beyond the judgment itself to try to determine the beneficiaries, it may not be possible to identify or locate the victims, in which case the government would retain the funds. *Cf. Liu v. SEC*, 591 U.S. 71, 87

---

[4] *See also United States v. Pioch*, 5 F.4th 640, 643 (6th Cir. 2021) ("[A] 'debt' [under the FDCPA] can constitute the amount due to be paid because of an assessment, an order of restitution (including restitution owed to individuals arising out of criminal cases), or another source of indebtedness to the United States."); *cf. United States v. Mays*, 430 F.3d 963, 965 (9th Cir. 2005) (noting that the Mandatory Victims Restitution Act provides that the FDCPA can be used to enforce orders of restitution).

(2020) ("The SEC, however, does not always return the entirety of disgorgement proceeds to investors, instead depositing a portion of its collections in a fund in the Treasury."). And even if the FTC might need judicial approval to deposit any leftover funds into the U.S. Treasury, the judgment is still "entered in favor of the commission," which is an amount "owing to the United States" and hence a "debt" under the FDCPA. *See* 28 U.S.C. § 3002(15)(B) (defining "United States" to include a "commission . . .of the United States").

Rodgers, and the dissent, rely on *United States v. Bedi*, 15 F.4th 222 (2d Cir. 2021), to argue that the judgment against Rodgers is not a "debt" under the FDCPA. That reliance is misplaced. *Bedi* involved an administrative law judge's order "requiring a private employer to remit back pay to its former employee." *Id*. at 223. In other words, the order required payment *directly* to the employee, not to the federal government, and thus the judgment was not a debt owed to the United States. *See id.* at 228 ("[T]he Administrative Order requires [defendants] to pay 'Ingvarsdóttir,' not 'the United States.'"). Here, by contrast, the judgment is payable to the FTC, not to a private party.

The dissent also relies on *United States v. Bongiorno*, 106 F.3d 1027 (1st Cir. 1997). There, the First Circuit determined that "a debt cannot be eligible for inclusion under the FDCPA if the United States is neither the *formal owner* nor the direct beneficiary of it." *Id.* at 1037 (emphasis added). The court came to this conclusion in large part by looking at the legislative history and the purported purpose of the statute to protect the public fisc. *Id.* at 1036–37 (quoting floor statement of Rep. Brooks). The court reasoned that if the money paid to the federal government is ultimately disbursed to others, then it does not benefit the government

and thus the judgment should not be considered a "debt" owing to the United States. *Id.*

But the FDCPA's statutory text does not support the First Circuit's purposivist characterization of "debt." *See Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("[A] statute is not to be confined to the 'particular application[s] . . . contemplated by the legislators.'"). Indeed, a judgment that is owed *to* the government, that can be collected only *by* the government, and that arises under a public-interest statute that vests enforcement authority exclusively *in* the government, is an amount "owing to the United States" and hence is a "debt" under the FDCPA. 28 U.S.C. § 3002(3)(B). The First Circuit recognized as much when it suggested that the result might have been different if the United States were the "formal owner" of the debt, *Bongiorno*, 106 F.3d at 1037, as is the case here, *see Nat'l Bus. Consultants*, 376 F.3d at 319 n.2, 320 (holding that a monetary judgment that the FTC secured on behalf of defrauded franchisees was a "debt" under the FDCPA and distinguishing *Bongiorno*, in part, on the ground that the FTC was "the formal owner of the entire debt" and "the only entity entitled to enforce the judgment"). Moreover, *Bongiorno* was superseded by statute. *See United States v. Witham*, 648 F.3d 40, 41 (1st Cir. 2011) (recognizing that the Mandatory Victim Restitution Act of 1996 authorizes the government to invoke the FDCPA to enforce all orders of restitution in criminal cases).

Finally, Rodgers makes two more arguments, neither of which is persuasive. First, she argues that the FTC was never authorized to demand such payment from her in the first place, given the Supreme Court's decision in *AMG Capital Management, LLC v. FTC*, 593 U.S. 67 (2021). She thus contends that the agency lacks power under Section 13(b) of the Federal Trade Commission Act to seek equitable

monetary relief. *See id.* at 70. That argument fails because this court and others have recognized that pre-*AMG* judgments for monetary relief under Section 13(b)—like the judgment in this case—may remain valid. *See, e.g.*, *FTC v. Hewitt*, 68 F.4th 461, 465–70 (9th Cir. 2023) (affirming denial of Rule 60(b) motion to set aside a pre-*AMG* monetary judgment awarded under Section 13(b)); *FTC v. Ross*, 74 F.4th 186, 191–96 (4th Cir. 2023) (same); *cf. Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758 (1995) ("New legal principles, even when applied retroactively, do not apply to cases already closed.").[5]

Second, Rodgers raises a new theory on appeal, arguing that under the *Erie* doctrine, *see Erie R. Co. v. Tompkins*, 304

---

[5] While the Supreme Court in *AMG* held that the FTC cannot seek equitable monetary relief under Section 13(b) because that provision addresses only injunctive relief, it did not disturb the FTC's power to obtain monetary relief under Section 19. Although Section 19 imposes additional requirements, it authorizes a court to "grant such relief as the court finds necessary to redress injury to consumers," including, but not limited to, "the refund of money or return of property" and "the payment of damages." 15 U.S.C. § 57b(b). It is not clear here if the court ordered monetary relief under Section 13(b) exclusively or also under Section 19. The district court mentions both Section 13(b) and Section 19 in its decision, but the judgment refers to "equitable monetary relief," which may suggest that it was relying only on Section 13(b). If the court relied on Section 19 to order monetary relief, then that is another reason why *AMG* has no effect here. *See, e.g.*, *FTC v. Credit Bureau Ctr., LLC*, 81 F.4th 710, 714 (7th Cir. 2023) (affirming the FTC's use of Section 19 for seeking monetary relief, in the form of restitution, post-*AMG*); *FTC v. Hanley*, Nos. 20-15143, 20-15144, 2022 WL 187848, at *1 (9th Cir. Jan. 20, 2022) (unpublished) (similarly determining that, in the wake of *AMG*, the FTC still may obtain restitution on behalf of consumers under Section 19(b)); *FTC v. Elegant Sols., Inc.*, No. 20-55766, 2022 WL 2072735, at *2–3 (9th Cir. June 9, 2022) (unpublished) (same).

U.S. 64 (1938), the FDCPA should not be read to preempt Nevada's statute of limitations. That argument is unavailing. *Erie* held that when federal courts adjudicate state law claims, "[t]here is no federal general common law." *Id.* at 78. As a result, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress," courts must apply state law as determined by the state's highest court or its legislature. *Id.* But state law "does not control the resolution of issues governed by federal statute." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 198 (1988). Put another way, the *Erie* doctrine does not apply here because the FDCPA is a federal statute that, by its terms, preempts contrary state law. 28 U.S.C. § 3003(d).

## II. The district court erred in quashing the writ of execution.

The district court also erred in holding that the FTC had to file a separate lawsuit under Nevada law to establish that the Trust is Rodgers's alter ego.

First, the district court misapplied and mistakenly relied on *Callie v. Bowling*, 160 P.3d 878 (Nev. 2007), to conclude that the FTC had to show that the Trust is Rodgers's "alter ego." Under the FDCPA, the FTC merely had to show that, as a trustee and beneficiary of the Trust, Rodgers has a substantial nonexempt interest in the Corona Vista property. Second, the district court failed to give preemptive effect to the FDCPA based on a misreading of 28 U.S.C. § 3010(a) concerning co-owned property.

### A. The FDCPA's broad definition of property includes the Corona Vista property.

The FDCPA provides that "[a]ll property in which the judgment debtor has a substantial nonexempt interest shall

be subject to levy pursuant to a writ of execution." 28 U.S.C. § 3203(a). Thus, the question is whether Rodgers has a "substantial nonexempt interest" in the Corona Vista property. The FDCPA defines "property" using "broad language so as 'to reach every interest in property that a [judgment debtor] might have.'" *United States v. Harris*, 854 F.3d 1053, 1055 (9th Cir. 2017) (per curiam) (quoting *United States v. Nat'l Bank of Com.,* 472 U.S. 713, 720 (1985)). "Property" includes "any present or future interest, whether legal or equitable, in real, personal . . . , or mixed property, tangible or intangible, vested or contingent, wherever located and however held (including community property and *property held in trust*)." 28 U.S.C. § 3002(12) (emphasis added).

It thus makes no difference for purposes of the FDCPA whether Hoskins and Rodgers own the Corona Vista property directly or through a trust or other legal entity. If they have any substantial nonexempt interest in the property, it is subject to levy by writ of execution under the FDCPA's procedures. *Cf. Harris*, 854 F.3d at 1056 (holding that a beneficiary's interest in two trusts was "property" under the FDCPA's definition of that term).

Here, the evidence shows that Rodgers has a substantial interest in the Corona Vista property. She resides there and is a trustee and beneficiary of the Trust. Rodgers admitted that the property is her residence and that it was purchased with the proceeds from the sale of her prior home. The evidence submitted with the FTC's writ application shows that Rodgers paid $980,000 for the property, using her law firm's trust account to make deposit and closing payments, and that she originally named herself as the buyer. At the last moment, however, Rodgers decided that she did not want her name on the deed and arranged to have Monte Bello, LLC,

take title. Monte Bello is owned by Resolute 21, LLC, which in turn is owned by the Trust.



Ownership scheme

The evidence also shows that Hoskins and Rodgers are the architects behind the Trust. The Trust owned Hoskins and Rodgers' previous residence, and both received proceeds from the sale of that property. And they have admitted that they are beneficiaries (and trustees) of the Trust. Despite their efforts, titling the property through a series of entities and a trust does not put the property outside the FDCPA's reach. The FDCPA authorizes levy on their property "however held." 28 U.S.C. §§ 3002(12), 3203(a).

Hoskins and Rodgers continue to have an equitable interest in the Corona Vista property as trustees and beneficiaries of the Trust, and that interest qualifies as a substantial interest for purposes of the FDCPA. *See Harris*, 854 F.3d at 1057 (holding that a beneficiary's interest in irrevocable, discretionary trusts qualified as property for purposes of the FDCPA).

Moreover, in any event, *Callie* does not support the conclusion that the FTC had to file a separate action to establish that the Trust is Rodgers's alter ego. *Callie* involves a completely different issue that has nothing to do with the FDCPA. There, a private plaintiff obtained a judgment in California against a corporation and sought to enforce it in Nevada. *Callie*, 160 P.3d at 879. The plaintiff moved to amend the domesticated judgment to add the president of the corporation under an alter ego theory, even though he was not named as a defendant in the original suit and was never served with a summons and complaint. *Id.* The Nevada Supreme Court held that due process required the plaintiff to file a new independent action against the corporation's president to assert her alter ego claim. *Id.* at 881.

Not so here. In this case, the FTC is not seeking to add the Trust as a defendant to an existing judgment. The FTC already has a judgment against Rodgers, and it is simply seeking to enforce that judgment by levying on real property in which Rodgers has an equitable ownership interest. The FTC merely had to show that, as a trustee and beneficiary of the Trust, Rodgers has an interest in the Corona Vista property under Nevada law that qualifies as a "substantial nonexempt interest" under the FDCPA. *Callie* has no bearing on that question.

## B. 28 U.S.C. § 3010(a) does not apply.

The district court further erred by rejecting the FTC's preemption argument based on its reading of an FDCPA provision relating to co-owned property. The provision cited by the district court states that "[t]he remedies available to the United States . . . may be enforced against property which is co-owned by a debtor and any other person only to the extent allowed by the law of the State where the property is located." 28 U.S.C. § 3010(a). The district court held that "[t]he property at issue here is a co-owned trust" and that, "[t]herefore, Nevada law governing execution of property applies."

A better reading of § 3010(a) is that it protects the interests of *innocent* co-owners. Under this provision, if a judgment debtor and an innocent third party share ownership interests in a single property, and state law protects co-owned property from enforcement, federal law likewise will protect the third party's interests. For example, in Nevada, a community property state, a spouse's share of community property is not "liable for the debts of the other spouse contracted before the marriage." Nev. Rev. Stat. § 123.050. So, under § 3010(a), the government could not levy Rodgers's share of community property to satisfy a debt incurred by Hoskins before their marriage.

There is no indication in the record that the property in question is co-owned by "any other person" than Hoskins and Rodgers, both of whom are "debtor[s]." 28 U.S.C. § 3010(a). And as trustees and beneficiaries of the Trust, Hoskins and Rodgers each have an equitable interest in the Corona Vista property. Each of their interests is subject to levy under the FDCPA pursuant to the writ of execution.

## CONCLUSION

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

---

BADE, Circuit Judge, dissenting in part and concurring in part:

I respectfully disagree with the majority's conclusion that the Federal Debt Collection Procedure Act (FDCPA) applies to the enforcement of a disgorgement decree for consumer redress entered in favor of the Federal Trade Commission (FTC). While the FDCPA supplies the exclusive procedures for collection of debts owed to the United States, 28 U.S.C. §§ 3001(a), 3203, not all amounts owed to the government are "debts" subject to the statute, *id.* § 3001(c). Because the disgorgement decree at issue here does not fall within the statutory definition of "debt," the FDCPA does not apply, and Nevada law governs the procedures for the writ of execution sought by the FTC. *See* Fed. R. Civ. P. 69(a)(1). The district court concluded that, under Nevada law, the FTC must first bring a separate alter-ego action before levying property in the hands of a third-party artificial entity and the FTC fails to challenge this ruling on appeal. Therefore, I must dissent from the majority's decision to reverse the order quashing the writ of execution.

I concur, however, in the majority's decision to reverse the order precluding future enforcement of the judgment. As an incident of sovereignty, the United States and its instrumentalities are not bound by general statutes of limitations unless expressly named. *United States v. Thornburg*, 82 F.3d 886, 893 (9th Cir. 1996) ("The Supreme

Court has instructed that, as a sovereign, the United States is subject to a limitations period only when Congress has expressly created one." (citing *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 133 (1938))).  The Nevada statute of limitations for the enforcement of a judgment does not expressly apply to the federal government, nor could the Nevada legislature even enact such a statute.  Accordingly, the district court erred in forbidding the FTC from enforcing the disgorgement decree by means other than the particular writ of execution sought below.

## I

## A

The FDCPA "provides the exclusive civil procedures for the United States . . . to recover a judgment on a debt," including procedures for the issuance of writs of execution. 28 U.S.C. §§ 3001(a), 3203.  The act, however, explicitly provides that it "shall not apply to an amount owing that is not a debt."  28 U.S.C. § 3001(c).  The statute defines "debt" as follows:

"Debt" means—
>    (A)  an amount that is owing to the United States on account of a direct loan, or loan insured or guaranteed, by the United States; or
>
>    (B)  an amount that is owing to the United States on account of a fee, duty, lease, rent, service, sale of real or personal property, overpayment, fine, assessment, penalty, restitution, damages, interest, tax, bail bond forfeiture, reimbursement, recovery of

> a cost incurred by the United States, or other source of indebtedness to the United States, but that is not owing under the terms of a contract originally entered into by only persons other than the United States;
>
> and includes any amount owing to the United States for the benefit of an Indian tribe or individual Indian, but excludes any amount to which the United States is entitled under section 3011(a).

28 U.S.C. § 3002(3).

The majority suggests that the equitable monetary judgment entered in favor of the FTC qualifies as a "debt" for purposes of the FDCPA because that judgment qualifies as a "source of indebtedness to the United States."[1] *Maj. Op.* at 13, 15–22. In the majority's view, anything that imposes

---

[1] To the extent that the majority is also relying on "restitution" as a basis for its holding, *cf. Maj. Op.* at 15, 20 n.4, it is incorrect. The FDCPA only covers amounts owing on account of "restitution . . . *to the United States.*" 28 U.S.C. § 3002(3)(B) (emphasis added). As used in this context, "[t]he word restitution means restoration." Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 4.1(1), at 370 (3d ed. 2018); *see also Restitution, n.*, Oxford English Dictionary (3d ed.) (Sense 1.a) ("The action of restoring or giving back something to its proper owner, or of making reparation to a person for loss or injury previously inflicted; . . . ."). The judgment in this case does not restore to the United States money that rightfully belongs to the public. Neither the FTC nor the United States was unjustly deprived of the money disgorged from the defendants; that money rightfully belongs to the consumers who had the misfortune of purchasing the defendants' services and whose injury the disgorgement decree is designed to redress.

"a legal duty to pay the federal government" qualifies as a "source of indebtedness to the United States." *Id.* at 15–16. The majority thus reasons that because the disgorgement decree (1) was entered in favor of the FTC and (2) imposes a monetary obligation on the defendants, the amount owed under that decree qualifies as a "debt" for purposes of the FDCPA. *Id.*

The majority is misreading the statutory text. As defined in the statute, "an amount that is owing to the United States on account of a . . . source of indebtedness to the United States" is generally a "debt" for purposes of the FDCPA. 28 U.S.C. § 3002(3)(B). This text plainly prescribes *two* necessary conditions, not one. First, there must be "an amount that is owing to the United States." Second, the amount must be owed "on account of a . . . source of indebtedness to the United States." Thus, as the text clearly prescribes, not every "amount owing" is a "debt" within the meaning of the FDCPA. 28 U.S.C. § 3001(c). In my view, and consistent with how the First and Second Circuits have interpreted the statute, a legal instrument is only a "source of indebtedness to the United States" if the amount owed under that instrument will inure to the benefit of the United States. *Accord United States v. Bongiorno*, 106 F.3d 1027, 1036 (1st Cir. 1997); *United States v. Bedi*, 15 F.4th 222, 227–28 (2d Cir. 2021) (overruling *NLRB v. E.D.P. Med. Comput. Sys., Inc.*, 6 F.3d 951 (2d Cir. 1993)).

The term "source of indebtedness to the United States" is a catch-all category appended to a long list of possible types of debts. "When faced with a catchall phrase like that, courts do not necessarily afford it the broadest possible construction it can bear. Instead, we generally appreciate that the catchall must be interpreted in light of its surrounding context and read to 'embrace only objects

similar in nature' to the specific examples preceding it." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024) (citation omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512 (2018)). Thus, the key to interpreting "source of indebtedness to the United States" is determining the essential quality (or qualities) shared by the specific examples listed in § 3002(3)(B).

The majority implicitly suggests that the shared essential quality of the specific examples listed in § 3002(3)(B)—and thus the defining feature of a "source of indebtedness to the United States"—is that they impose upon a person an obligation to pay money to the government. This is implausible for three reasons.

First, the majority's interpretation would render superfluous the separate definitional phrase "an amount that is owing to the United States." I agree with the majority that a sum of money a person is legally obliged to pay the government is "an amount that is owing to the United States." But under the majority's interpretation, the second element of the statutory definition—"on account of a . . . source of indebtedness to the United States"—is satisfied whenever a person has a legal obligation to pay the government a sum of money. As a result, the majority is interpreting the two distinct components of the statutory definition to be entirely duplicative. "Interpretations that nullify statutory provisions or render them superfluous are, and should be, disfavored." *Patagonia Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 517 F.2d 803, 813 (9th Cir. 1975).

Second, giving the phrase "source of indebtedness to the United States" its broadest possible construction would defeat the Congress's purpose in listing specific examples in

the statute.  The canon of *ejusdem generis* "is based on the theory that, if the Legislature had intended the general words to be used in their unrestricted sense, it would have made no mention of the particular classes."  *In re Bush Terminal Co.*, 93 F.2d 659, 660 (2d Cir. 1938); *see also United States v. Insco*, 496 F.2d 204, 206 (5th Cir. 1974) ("[T]he doctrine of ejusdem generis[] warns against expansively interpreting broad language which immediately follows narrow and specific terms.  To the contrary, this maxim of statutory analysis counsels courts to construe the broad in light of the narrow, in a commonsense recognition that general and specific words, when present together, are associated with and take color from each other."); *accord Harrington*, 603 U.S. at 217.  Had Congress intended "debt" to mean any amount owing under a legal obligation, it would not have bothered to define that term in such a complex manner.

Third, the majority's interpretation is inconsistent with the statutory provision stating that the FDCPA "shall not apply with respect to an amount owing that is not a debt or to a claim for an amount owing that is not a debt."  28 U.S.C. § 3001(c).  The clear implication of this provision is that not every "amount owing" qualifies as a "debt" for purposes of the FDCPA.  While I agree with the majority that § 3001(c) can be viewed as a "belt-and-suspenders" reminder to follow the statutory definition of "debt," *Maj. Op.* at 18–19, that does not explain why Congress included this provision in the first place.  The best explanation comes from the statutory text, which does not equate "debt" with "an amount owing." It is therefore inconsistent with § 3001(c) to interpret "source of indebtedness" to refer broadly to anything that creates a legal obligation to pay money to the government. *Cf. Rodriguez v. Sony Comput. Ent. Am., LLC*, 801 F.3d 1045, 1051 (9th Cir. 2015) ("Courts must interpret the

statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." (internal quotation marks omitted) (quoting *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015))).

Instead, the common feature of the examples listed in § 3002(3)(B) of "source[s] of indebtedness to the United States" is that they are all "payments in which the government has a direct pecuniary stake." *Bongiorno*, 106 F.3d at 1036; *see also Bedi*, 15 F.4th at 227–28 (holding that "the ordinary meaning of [the statutory definition of 'debt'] requires the United States to be the holder of the debt . . . such that it has a direct financial stake in the debt itself"). This interpretation creates no redundancy with the other parts of the statutory definition; it explains why Congress would have chosen to define "debt" in such a complicated way; and it does not conflict with § 3001(c). It is therefore the most natural interpretation of the statutory text.

This interpretation is also consistent with the general purpose of the statute. As the majority notes, "Congress enacted the FDCPA in 1990 'to create a comprehensive statutory framework for the collection of debts owed to the United States government.'" *Maj. Op.* at 12 (quoting H.R. Rep. No. 101-736, at 23 (1990)). And as the next sentence of that same committee report explains, Congress created this "uniform federal framework for the collection of Federal debts in the Federal courts [to] improve the efficiency and speed in collecting those debts, *thereby lessening the effect of delinquent debts on the massive federal budget deficit* [that was] undermining the economic well-being of the Nation." H.R. Rep. No. 101-736, at 23 (emphasis added). It

therefore makes sense that Congress would have tried to carefully circumscribe the definition of "debt" (with one exception for Indian tribes) to cover only an amount owing "which, when paid, swells the public fisc." *Bongiorno*, 106 F.3d at 1036; *accord Bedi*, 15 F.4th at 229–30.

I agree with the majority (and practically every other modern jurist) that neither abstract notions of statutory purpose nor excerpts from a statute's legislative history can override a statute's actual text. *Maj. Op.* at 12 n.1, 19, 21–22; *see also* Caleb Nelson, *What is Textualism?*, 91 Va. L. Rev. 347, 364 & n.50 (2005) ("Nowadays . . . it is hard to find anyone who advocates such untethered use of legislative history."). But a court does not depart from that principle by merely considering a statute's general purposes to guide the interpretation of unclear statutory terms. *See, e.g.*, *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199–202 (2007) (Thomas, J.); *Bittner v. United States*, 598 U.S. 85, 98–99 (2023) (Gorsuch, J.). Similarly, "[l]egislative history may be useful in showing the scope of an enactment," so long as it is being used to clarify the scope by reference to the statutory text. Frank H. Easterbrook, *What Does Legislative History Tell Us?*, 66 Chi.-Kent L. Rev. 441, 442–44 (1990). And that is precisely how purpose and legislative history are being used here—to confirm the meaning of "source of indebtedness to the United States" that is suggested by the surrounding statutory context, and to clarify the reach of the FDCPA as set forth by the statutory definition of "debt." All else being equal, we should adopt the interpretation that "reflects the most natural reading of the statutory language and [is] most consistent with its purpose." *Barber v. Thomas*, 560 U.S. 474, 492 (2010); *accord Connell v. Lima Corp.*, 988 F.3d

1089, 1097 (9th Cir. 2021).   The direct beneficiary test employed by the First and Second Circuits does just that.[2]

## B

Because a legal obligation to pay an agent or instrumentality of the federal government only qualifies as an "an amount that is owing to the United States on account of . . . [a] source of indebtedness to the United States" when the money to be paid will inure to the benefit of the United States, the equitable monetary judgment at issue here is not a "source of indebtedness to the United States."   To determine the actual beneficiary of a monetary judgment, we may at the very least look to the judgment itself, the

---

[2] The majority's attempts to distinguish *Bongiorno* and *Bedi* are without merit.   The majority notes that "*Bongiorno* was superseded by statute." *Maj. Op.* at 21–22.   Although it is true that the Mandatory Victims Restitution Act (MVRA) superseded *Bongiorno*'s holding by making the FDCPA applicable to criminal restitution orders, "it did so independent of the definition of 'debt' in the FDCPA itself." *United States v. Witham*, 648 F.3d 40, 49 (1st Cir. 2011); *accord United States v. Mays*, 430 F.3d 963, 966 (9th Cir. 2005) (noting that Congress "specifically import[ed] the FDCPA's procedures into the MVRA").   It therefore does not undermine or abrogate *Bongiorno*'s interpretation of the FDCPA—the meaning of the statutory definition has not changed since the time of its enactment. *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020).

The majority also suggests that the reliance on *Bedi* is misplaced because the administrative order "required payment *directly* to the employee, not to the federal government." *Maj. Op.* at 21.   But the Second Circuit only relied on this fact to show that "the Government has no claim to the debt itself"—i.e., no "direct financial interest in recovering the sum"—and there is no indication whatsoever that this fact was dispositive as to that inquiry. *Bedi*, 15 F.4th at 228.   This fact could not possibly have influenced the court's interpretation of § 3002(3)(B), which is a pure question of law, nor does the absence of this fact here suggest that the government has a direct financial interest in recovering the disgorged funds.   The purported distinction is therefore illusory.

dispositive order, the pleadings, and the statute(s) which authorized the judgment. *See Oklahoma v. Texas*, 256 U.S. 70, 88 (1921); *see also* 49 C.J.S. *Judgments* § 163 (describing what generally comprises "the judgment roll or record"); *United States v. Sisson*, 399 U.S. 267, 281 n.10 (1970) (describing what constitutes the "face of the record"); *Nalle v. Oyster*, 230 U.S. 165, 176 (1913) (referring to the judgment roll as the "strict record").

The final judgment "entered in favor of the Federal Trade Commission," as amended, ordered Rodgers to pay $1,550,848.48 "as equitable monetary relief for ill-gotten gains." As the FTC's complaint makes clear, such relief was sought "to redress injury to consumers resulting from the Defendants' violations of the FTC Act, the Telemarketing Act and the [Telemarketing Sales Rule]." The injury to consumers will not be redressed if the government is the direct beneficiary of the judgment—the consumers will still be out of the funds wrongfully taken from them by the defendants.

The consumer-redress purpose identified in the complaint is consistent with the statutory provisions the district court relied upon in issuing such relief—"Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b." Section 19 authorizes courts "to grant such relief as the court finds necessary to redress injury to consumers," including "the refund of money." 15 U.S.C. § 57b(b). The money is not in any sense being refunded if the money owed by Rodgers inures to the benefit of the United States. Similarly, Section 13(b) authorizes a court to issue "a permanent injunction" against "any [] act or practice" in violation of a provision of law enforced by the FTC. 15 U.S.C. § 53(b). Quite plainly, this statutory language authorizes only prohibitory injunctions against actual violations of law and

does not authorize any monetary relief whatsoever, and we should not assume that the district court exceeded its authority absent a clear indication that it did so.  *See AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67, 82 (2021); *SEC v. Worthen*, 98 F.3d 480, 483 (9th Cir. 1996).  But to the extent the district court erroneously relied on this provision in issuing the monetary relief, because injunctive relief is "inherently an equitable remedy," *Knudson*, 534 U.S. at 211 n.1, any such monetary relief ordered under that provision would have to be equitable in character—precisely what the district court ordered.

In light of the circumstances of this case, the monetary relief ordered can only be considered equitable if it does not inure to the government's benefit.  A monetary remedy is not equitable in character if it is a penalty, *Tull v. United States*, 481 U.S. 412, 422–23 (1987), and a monetary remedy qualifies as "a pecuniary penalty" when the remedy "compel[s] the payment by the defendant to the plaintiff of money in which the plaintiff has not as yet acquired any specific right," *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 291 (1888).  In seeking this relief, the government made no assertion of entitlement to the funds either on the basis of title or as compensation for an actual injury.  Thus, the *only* way the relief here could possibly be equitable is if the defendants' obligation to transfer the specified funds to the FTC was understood to impose a constructive trust on those funds and to effectuate the substitution of the FTC as trustee in place of the defendants, thereby imposing an obligation upon the FTC to return the money to the victims of the defendants' scheme.[3]  *Cf. SEC v. Jarkesy*, 603 U.S. 109, 124

---

[3] The majority suggests that even if we were to look beyond the four corners of the judgment, "it may not be possible to identify or locate the

(2024) ("The final proof that this remedy is punitive [and not equitable] is that the SEC is not obligated to return any money to victims." ).  Accordingly, the money owed under the regulatory disgorgement decree cannot be considered "an amount that is owing to the United States on account of . . . [a] source of indebtedness to the United States."  28 U.S.C. § 3002(3)(B).

## II

Because the FDCPA does not apply here, procedures for the writ of execution are governed by Nevada law.  *See* Fed. R. Civ. P. 69(a)(1).  The district court ruled that Nevada law requires a judgment creditor to file a separate alter-ego action to reach property held by a third-party entity, and the FTC does not contest the correctness of that ruling in this appeal.  The appellant bears the burden of showing error in the judgment or order appealed, and this court ordinarily will not address an issue that the appellant fails to argue in its

---

victims, in which case the government would retain the funds."  *Maj. Op.* at 20 (citing *Liu v. SEC*, 591 U.S. 71, 87 (2020)).  For one thing, "[i]t is an open question" whether allowing the government to deposit disgorged funds into the Treasury when it is infeasible to distribute them to injured consumers would be "consistent with equitable principles" and other limits on the FTC's authority to seek disgorgement.  *Liu*, 591 U.S. at 89–90.  For another, even if it would be permissible for such funds to eventually be deposited into the treasury, based on the Court's reasoning in *Liu*, the government must first receive judicial approval (based on a determination of infeasibility or other good cause) before taking such action.  *See id.*  Contrary to the majority's reasoning, the requirement that the government seek judicial approval before depositing the funds in the treasury means that the government does not yet have absolute title to those funds, and therefore it does not *presently* have a direct financial stake in the judgment.  That the government may eventually acquire a stake in a debt does not make the FDCPA available for enforcement of that debt prior to acquisition.

opening brief. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025); *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). Accordingly, the district court's order quashing the writ of execution should be affirmed.

This is not to say that defendants subject to a regulatory disgorgement decree can evade enforcement by placing the funds in the control of shell entities or other similar measures. Specific enforcement of the constructive trust remains available "not only while it is in the hands of the original wrongdoer, but as long as it can be followed and identified in whosesoever hands it may come, except into those of a bona fide purchaser for value and without notice." *Pioneer Mining Co. v. Tyber*, 215 F. 501, 505 (9th Cir. 1914) (quoting 3 *Pomeroy's Equity Jurisprudence* § 1051 (3d ed. 1905)). Given that the record suggests that none of the entities with a property interest in the Corona Vista property was a bona fide purchaser for value, it would appear that the judgment could be enforced against those entities directly. *See* Fed. R. Civ. P. 71. Additionally, the monetary relief at issue here is equitable in character, and a court may enforce its decree in accordance with procedures traditionally available in equity "without reference to state practice." *Hamilton v. MacDonald*, 503 F.2d 1138, 1149 (9th Cir. 1974) (citing Fed. R. Civ. P. 70). Thus, even though the writ of execution was properly quashed, other enforcement mechanisms remain available to the FTC.

### III

Finally, even though I disagree with the majority about the applicability of the FDCPA, I agree that the district court erred in precluding future collection of the disgorged funds based on Nevada's statute of limitations governing

enforcement of a judgment. *Maj. Op*. at 14–15. As an incident of sovereignty, statutes of limitation are not interpreted to run against a state or federal government unless the statute explicitly provides otherwise. *Guar. Tr.*, 304 U.S. at 132–33; *Thornburg*, 82 F.3d at 893; *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 96 (2006). Thus, "[i]n the absence of a federal statute expressly imposing or adopting one, the United States is not bound by any limitations period." *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1489 (9th Cir. 1993).

The Nevada statute does not expressly provide that the federal government is subject to its six-year limitation period. *See* Nev. Rev. Stat. § 11.190.1(a). "If it did, it would be beyond the power of the State to pass it, a gross usurpation, and void." *United States v. Thompson*, 98 U.S. (8 Otto) 486, 490 (1878). And the incorporation of state procedure under Rule 69(a)(1) should not be interpreted to abrogate the federal government's "implied immunity . . . to local statutes of limitations." *Guar. Tr.*, 304 U.S. at 133 (interpreting the Conformity Act of 1872, ch. 255, § 5, 17 Stat. 196, 197 (codified at Rev. Stat. § 916 and the former 28 U.S.C. § 727)); *see also Hamilton*, 503 F.2d at 1148 (explaining that this section of the Conformity Act was "the predecessor of Rule 69"); 28 U.S.C. § 727 (1946) (noting abrogation of this section in light of Rule 69's promulgation). Accordingly, the order precluding future enforcement of the judgment should be reversed.

For these reasons, I respectfully dissent in part and concur in part.